## IN THE UNITED STATES DISTRICT COURT
## WESTERN DISTRICT OF MISSOURI
## CENTRAL DIVISION

| | |
|---|---|
| THE CURATORS OF THE UNIVERSITY OF MISSOURI, | ) ) ) |
| Plaintiff, | ) ) |
| v. | ) ) Case No. * |
| GALEN J. SUPPES, WILLIAM R. SUTTERLIN, RENEWABLE ALTERNATIVES, LLC; and HOMELAND TECHNOLOGIES, LLC, | ) ) ) ) ) ) |
| Defendants. | ) ) ) |

## **COMPLAINT**

This is an action for a declaratory judgment that the University of Missouri is the lawful and proper owner of inventions, patents and patent applications conceived and reduced to practice by Galen Suppes and William R. Sutterlin during and in the course of their employment with the University. Defendants breached their agreements to vest ownership in all such intellectual property in the University, failed to comply with University rules, and defendant Suppes refused to follow the rulings of the University's Patent Committee. The University seeks in addition an injunction requiring defendants to provide a listing of all such inventions, patents and patent applications and an accounting of all monies received by any of the defendants arising out of any such inventions, patents and applications (all information that has been requested of Suppes in a faculty grievance proceeding and otherwise, but which he has refused to provide); an injunction requiring Suppes to execute documents sufficient to perfect the University's ownership in such patents and applications so that the University can protect its rights; and compensation for the damage defendants' conduct has caused to the University.

2438245\01

## PARTIES

1. Plaintiff, The Curators of the University of Missouri ("University"), is an arm or instrumentality of state government in the State of Missouri and whose primary administrative offices and chief executive officer are located in Columbia, Missouri.

2. Defendant Galen J. Suppes ("Suppes") is a resident of the State of Missouri, currently residing at 4008 Day Flower Court, Columbia, Missouri 65203. Suppes is and has been since approximately August, 2001, employed by the University as a professor of Chemical Engineering.

3. Defendant William R. Sutterlin ("Sutterlin") is believed to be a resident of the State of Alabama, with a last known address of P.O. Box 861417, Tuscaloosa, Alabama.

4. Defendant Renewable Alternatives, LLC, ("RA") is a limited liability company believed to have been created in 2002 by Suppes and now, on information and belief, solely owned by Sutterlin, with an address of P.O. Box 861417, Tuscaloosa, Alabama. On information and belief, Sutterlin purported to assign inventions made during his employment by the University to RA, contrary to his obligations to the University. RA, acting through Suppes and Sutterlin, entered into various contracts/agreements with third-parties, wherein RA claimed ownership and purported to license technology that was in fact owned by the University.

5. Defendant Homeland Technologies, LLC, ("HT") is a Missouri limited liability company believed to be solely owned and controlled by Suppes, with a principal place of business in Columbia, Missouri. On information and belief, Suppes and/or Sutterlin, acting in their individual capacities or on behalf of RA, have purported to transfer or assign inventions, patents, patent applications or other intellectual property that is owned by the University to HT.

## JURISDICTION AND VENUE

6. This Court has subject matter jurisdiction over this action under and by virtue of the Declaratory Judgment Act, 28 U.S.C. § 2201, and 28 U.S.C. § 1338(a) in that this action involves patent subject matter, including disputes as to the conception and reduction to practice of inventions for which patent applications have been filed, over which this Court has exclusive jurisdiction. This Court has supplemental jurisdiction over the state law claims asserted herein under 28 U.S.C. § 1367.

7. This Court has personal jurisdiction over all defendants because they either are residents of Missouri and can be served in this District, or they were residents of Missouri at the time of the events that give rise to this action, or they committed torts and other wrongful conduct outside Missouri that has injured and damaged the University, a resident of Missouri.

8. Venue is proper in this District under 28 U.S.C. § 1391 in that defendants Suppes, HT and TV reside in this District and a substantial part of the events giving rise to this cause occurred in this District.

## GENERAL ALLEGATIONS

9. On August 1, 2001, Suppes assumed a faculty position at the University, as an Associate Professor of Chemical Engineering in the Department of Chemistry Engineering.

10. On August 18, 1998, Sutterlin began employment for the University as a Graduate Teaching Assistant in the Department of Chemistry. On or about June 1, 2004, Sutterlin assumed an employment position at the University as a Post-Doctoral Fellow in the Department of Chemical Engineering.

11. Suppes and Sutterlin both entered into written employment agreements with the University in which they agreed

3

to accept the position on the terms specified, contingent upon the availability of funds and University approval, and with the understanding that it is subject to all rules, orders and regulations of the Board of Curators.

The rules, orders and regulations of the University were set forth in the Collected Rules and Regulations ("Collected Rules").

12. Section 100.020(B) of the Collected Rules states:

If a patent or Plant Variety Protection application is filed upon an Invention or Plant Variety which has been made by an employee of the University within the general scope of his/her duties in Section 100.020D.1 hereof, but which has not been reported to the Patent Committee pursuant to these regulations, title to such Invention or Plant Variety shall immediately vest in the University and the contract of employment shall be considered as an assignment of such rights, and each employee as a condition of employment agrees to execute any assignments requested by the University.

13. Section 100.020(d)(1)(a) of the Collected Rules states:

The University, as the employer and as the representative of the people of the state, shall have the ownership and control of any invention or plant variety developed in the course of the employee's service to the University. Each employee of the University is required and shall upon request assign to the Curators of the University of Missouri all domestic and foreign rights to any invention or plant variety made by the employee within the general scope of her/his duties as employee of the University, unless such requirement is waived in writing by the University.

14. Under the Collected Rules, if a faculty member believes that an invention he or she has made falls outside the scope of his duties or services, he is required to nonetheless disclose the invention to the University, assign it and ask the University to waive ownership of the invention. To this end, the University requires faculty to submit invention disclosure documents, on a University-approved form, for each invention created during the course of the faculty member's employment with the University. This procedure protects the University by giving it oversight of the patent prosecution process, which includes the ability of the University to retain patent counsel.

2438245\01

15. From about August 1, 2001 to the present, Suppes has invented several inventions within the scope of his duties and services to the University. These inventions are the property of the University. But rather than disclose and assign those inventions as required, Suppes has on approximately 31 occasions submitted invention disclosure forms that were *altered*, usually by deleting or substantially modifying the specific assignment language contained in the forms such that Suppes did not in fact assign any meaningful rights to the University. On these occasions Suppes submitted the forms without bringing his alterations to anyone's attention.

16. Suppes has on other occasions denied that such inventions were within the scope of his duties and services, usually by asserting that they were conceived and reduced to practice without use of University facilities or resources or while Suppes was not working for the University.

17. Since about September 5, 2001, Suppes and/or Sutterlin have filed multiple patent applications, including provisional, non-provisional and foreign applications, without disclosing those applications to the University, without acknowledging the University's ownership, and without permitting the University to oversee the prosecution of the patent applications to protect its property rights. As a result of defendants' actions, various patent applications have been abandoned, denied, and/or licensed to third parties without any knowledge on the part of the University. The University is presently aware of two (2) patent applications that are the subject of office actions by the Patent Office, to which Suppes has indicated that he does not intend to respond, but about which Suppes has refused to execute documents necessary for the University to respond and protect its rights.

18. On September 5, 2001, after his employment at the University began, Suppes filed a patent application in the United States Patent and Trademark Office ("USPTO"),

application serial number 09/945,682, titled "Fatty-acid thermal storage devices, cycle, and chemicals," which is described as "a method for producing phase change materials." This application issued as a patent on June 10, 2003, U.S. No. 6,574,971. When this patent came to light in early 2007 and the University demanded that it be assigned to the University, Suppes asked the University Patent Committee to declare that the '971 patent, along with three (3) other patent applications, were his and not the University's because he conceived and reduced these inventions to practice prior to or outside the scope of his duties at the University. The Patent Committee rejected Suppes' request with respect to three of the inventions and referred the '971 patent to outside counsel for an opinion. The University President affirmed the Committee's recommendations. Nonetheless, Suppes has refused on at least two occasions to execute assignment forms sent to him by the University covering these inventions.

19. On or about January 8, 2003, on behalf of RA, Suppes signed an "Allocation of Rights" agreement between RA and the University. That Allocation of Rights Agreement provided that if RA received funding from the National Science Foundation ("NSF"), RA would make a subaward to the University and the University would grant RA an option to license the rights to University-owned intellectual property resulting from the performance of the subaward. The Allocation of Rights agreement did not grant RA any rights to background intellectual property already in existence and owned by the University. RA did not exercise its option to license any University-owned intellectual property resulting from performance of the subaward.

20. On or about March 30, 2005, RA entered into a license agreement with Mid-America Research and Development Foundation ("MRDF") for the use of technology relating to the conversion of glycerin to acetol, propylene glycol and/or antifreeze. This technology included background intellectual property existing and owned by the University prior to the

6

subaward described in Paragraph 20 above, University-owned intellectual property resulting from performance of the subaward, University-owned intellectual property resulting from sponsored research agreements with third parties other than RA, and future intellectual property. Neither Suppes nor RA disclosed this agreement to the University until well after its execution. Through this agreement, Suppes and RA purported to grant MRDF an exclusive license to the University's property, without the University knowing about or receiving any benefit from the agreement.

21. The RA/MRDF license agreement signed by Suppes warranted that "RA is the sole holder of all right, title and interest in and to the Licensed Products and Methods, free from the obligation of any license or encumbrance whatsoever, and RA has full right to grant the licenses to MRDF." That warranty was false and knowingly so in that Suppes and RA knew or should have known that the rights to this invention were owned by the University.

22. On or about July 15, 2005, MRDF, based upon the March 30, 2005 license with RA, sub-licensed the technology to Senergy Chemical Corporation ("Senergy"). The sub-license specifically purported to include intellectual property owned by the University.

23. On or about February 9, 2006, the University became aware of the license agreement entered into between RA and MRDF. The University discovered that Suppes, Sutterlin and RA had worked with MRDF patent attorneys to file patent applications concerning intellectual property owned by University which was improperly licensed to MRDF by RA and sublicensed by MRDF to Senergy. The University owned all of the intellectual property rights "licensed" by Suppes and RA to MRDF and sublicensed to Senergy, which upon this fact coming to light jeopardized the relationship between the University and MSMC, MRDF and Senergy.

24. Suppes and Sutterlin, acting through RA, violated the Collected Rules when they entered into the agreement with MRDF, and purported to deprive the University of its interest in the intellectual property generated by Suppes and Sutterlin during and within the scope of their employment by University. Further, the agreement with MRDF covered not just present inventions, but all future inventions by Suppes and Sutterlin related to the technology and acquired by RA, which potentially deprived the University of its ownership rights in future inventions made by Suppes and Sutterlin.

25. Despite being advised that he had no authority to enter into any contracts on behalf of the University, in early March of 2008, Suppes claimed that he had the right to negotiate the transfer of technology, which was owned by University, on behalf of RA. Defendant Suppes stated on various occasions that the University was not entitled to ownership of the inventions that he created. On or about January 23, 2006, Suppes told University officials that "you can assume that the UM has no right on any IP generated in my laboratory." A year later Suppes stated, in response to a request from the University, that any patent applications that he filed without disclosure involved inventions that did not "utilize facilities of the University." Suppes never disclosed to which patent applications he referred, never disclosed these inventions to the University, and failed to provide proof that any such inventions were created outside of the scope of his employment at the University. Suppes filed four invention waiver requests in 2007, none of which were approved by the University because of Suppes' failure to provide evidence that the inventions were created outside the scope of his duties for the University.

26. On or about January 4, 2007, via email correspondence entitled "request – payment for 06 work," Suppes enticed Senergy into "donating" $30,000.00 to fund Suppes' research without the knowledge of the University. On behalf of his company RA, Suppes, on or

about February 20, 2007, "donated" the $30,000.00 with no strings attached to an unrestricted University account over which Suppes had control. Senergy later challenged Suppes's claim that its contribution was a donation. To the contrary, Senergy claimed it provided Suppes not only the money but also equipment, some of which Suppes claimed was destroyed. Senergy ultimately demanded the return of its $30,000 and the equipment it had provided to Suppes.

27. Suppes interfered with the University's relationships with MSMC, MRDF and Senergy when he failed to sign documents needed to secure intellectual property rights and threatened to release confidential information about University-owned technologies which RA had purported to license to MRDF and MRDF had sublicensed to competitors of Senergy. On or about January 10, 2007, Suppes refused a request to sign documents necessary to secure patent rights in China for technologies owned by University. On February 27, 2007, Suppes threatened Senergy by stating that he was considering communicating with a competitor of Senergy's regarding research relating to the distillation process of producing acetol. On August 29, 2007, via email correspondence entitled "working with competition," Suppes threatened to disclose to a competitor of Senergy's the intellectual property in which Senergy had invested, an act that significantly impaired the relationship between the University and Senergy to the point where MSMC/MRDF informed the University that they would never do business with Suppes again. On February 18, 2008, an Indonesian patent application was abandoned because of Suppes' failure to sign documents, resulting in the University being denied the benefit of royalties from MSMC/MRDF and Senergy investments in Indonesia.

28. In May 2008, Suppes filed a grievance against University, in particular, against the Technology Management and Industry Relations department ("TMIR") and various University employees.

29. Count I of Suppes' grievance claims that TMIR failed to act appropriately in response to the obligations of the University/MSMC Research Agreement and the Master License Agreement between MSMC and University, attached to said Research Agreement. Count II of Suppes' grievance is directed to TMIR's alleged failure to release patentable technology, including the technology that Suppes claims is not owned by University described herein. Count III of Suppes' grievance is directed to the alleged violation of Suppes' academic freedom related to technology transfer of intellectual property generated by Suppes. Count IV of Suppes' grievance raises issues against TMIR regarding invention disclosure. Count V of Suppes' grievance claims that the TMIR staff acted wrongly in describing Suppes's actions involving his invention disclosures. Count VI of Suppes' grievance claims the actions of the TMIR and University staff interfered with Suppes' ability to market the inventions that are the subject of this action. The University denied all of these claims and asserted that Suppes, when he entered into the contract with MRDF, when he modified the invention disclosure forms, and when he refused to comply with the Collected Rules, all as alleged herein, caused the problems about which he complains. The University also requested of Suppes in the grievance proceeding much of the same information that is the subject of this action, but which Suppes has consistently refused to provide.

30. As part of the grievance process, Suppes initially provided the grievance officer with copies of nine (9) patent applications he had filed, then instructed the grievance officer not to provide five (5) of them to the University respondents in the grievance, claiming that they were not the property of the University. The University was not notified of the subject matter of the five "withdrawn" inventions, except that they were developed during the course of Suppes'

10
2438245\01

employment by the University. Suppes violated his employment agreement when he failed to disclose and assign these five inventions to the University.

31. On or about June 2, 2008, Suppes purported to transfer his share of the ownership of RA to Sutterlin, who subsequently relocated to Alabama. Included in this transfer were all of Suppes' rights to Phase Change Material Technology, a technology never disclosed to University but developed in the course of Suppes' employment with the University. Suppes started a new corporation, HT, in which Suppes was the sole owner and to which RA purportedly transferred University-owned intellectual property over which RA had previously asserted ownership. Suppes stated "Dr. Suppes is not paid summer salary and reserves rights to all intellectual property developed during the summer." Suppes and Sutterlin, through the vehicles of RA and HT, schemed to deprive the University of its ownership rights. RA and HT, at the least, have purported to own intellectual property that actually and properly belongs to the University.

32. On November 10, 2008, University officials delivered an assignment document to Suppes and asked him to formally assign all inventions of which the University was aware and which were developed during the course of his employment at the University. Defendant Suppes responded by providing, as he had done in the past on numerous occasions, an altered assignment document with modified language impacting assignment rights and also the removal, without justification, of certain inventions.

## COUNT I

**(Declaratory Judgment for Determination of Ownership and Dates of Conception and Reduction to Practice for Inventions Created by Defendants)**

33. Plaintiff incorporates by reference paragraphs 1 through 32 of the Complaint as though fully restated herein. There is a concrete dispute and therefore an actual case or controversy between defendants and the University with respect to what Suppes and Sutterlin

11

have conceived and reduced to practice since they began working for the University, and as to the ownership of such inventions and other intellectual property, including whether RA and/or HT properly own any such inventions or other intellectual property.

34. Suppes owes the University an accounting of all inventions created, in whole or in part, by him since August 1, 2001, but Suppes has failed and refused to provide such an accounting.

35. Sutterlin owes the University an accounting of all inventions created, in whole or in part, by him since August 18, 1998, but has failed and refused to provide such an accounting.

36. The University is aware of inventions, including patent applications and patents, by Suppes and Sutterlin that have not been disclosed to the University or assigned to the University, notwithstanding the fact that such inventions are properly owned by and are property of the University.

37. On information and belief, the University is aware of licensing agreements and contracts entered into by Suppes and Sutterlin purporting to grant rights to intellectual property owned by the University without permission from the University.

38. Defendants Suppes and Sutterlin have repeatedly claimed that the intellectual property at issue is not owned by the University because the intellectual property was not invented during and within the scope of their employment by the University.

39. To determine what inventions by Suppes and Sutterlin are owned by the University, an accounting by Suppes and Sutterlin of all inventions since their employment by University began, August 1, 2001 for Suppes and August 18, 1998 for Sutterlin, is required to determine a date of invention, including the date of conception and the date of reduction to

2438245\01

practice. Any such inventions conceived or reduced to practice during either of defendants' employment by University are and should be declared to be owned by the University.

40. A determination of the date of invention, including the date of conception and the date of reduction to practice, is a question exclusively governed by federal patent law, specifically 35 U.S.C. § 101 et seq.

41. Defendants' continued denial to the University of inventions owned by the University has resulted in damages to the University, including, but not limited to loss of income, loss of royalties, loss of business opportunities and deprivation of University resources.

## COUNT II

### (Declaratory Judgment as to Automatic Assignment of all Inventions created by Defendants)

42. Plaintiff incorporates by reference paragraphs 1 through 41 of the Complaint as though fully restated herein.

43. Suppes and Sutterlin, as employees of the University, agreed to abide by the Collected Rules and Regulations of the University.

44. Section 100.020B of the Collected Rules and Regulations states "If a patent or Plant Variety Protection application is filed upon an Invention or Plant Variety which has been made by an employee of the University within the general scope of his/her duties in Section 100.020D.1 hereof, but which has not been reported to the Patent Committee pursuant to these regulations, title to such Invention or Plant Variety shall immediately vest in the University and the contract of employment shall be considered as an assignment of such rights, and each employee as a condition of employment agrees to execute any assignments requested by the University."

45. Section 100.020(d)(1)(a) of the Collected Rules and Regulations states "The University, as the employer and as the representative of the people of the state, shall have the ownership and control of any invention or plant variety developed in the course of the employee's service to the University. Each employee of the University is required and shall upon request assign to the Curators of the University of Missouri all domestic and foreign rights to any invention or plant variety made by the employee within the general scope of her/his duties as employee of the University, unless such requirement is waived in writing by the University."

46. The University, based upon this language, is entitled to a declaration that such language constitutes an automatic assignment of all inventions developed by Suppes and Sutterlin since their employment by University began, on August 1, 2001 for Suppes and August 18, 2008 for Sutterlin, and that based on such automatic assignment the University owns all inventions, patents and patent applications conceived or reduced to practice by Suppes and/or Sutterlin since the respective dates of their employment.

47. A determination of the question of automatic assignment is a matter of federal law, 35 U.S.C. § 261.

48. In failing to cooperate with the University, defendants have deprived the University of its rights as an owner under federal patent law to take action in patent prosecution cases to ensure its intellectual property is protected, including the pending office actions.

49. The University is entitled to the ownership and assignment of all inventions of defendants, as set forth in the Collected Rules and Regulations.

50. Without assignment, the University is deprived access to patent application files, a right under federal patent law, and is therefore unable to protect its rights in the intellectual property.

# COUNT III
## (Breach of Contract)

51. Plaintiff incorporates by this reference paragraphs 1 through 50 of the Complaint as though fully restated herein.

52. On or about August 1, 2001, Suppes and the University entered into an employment agreement whereby Suppes agreed that the University would own all inventions and intellectual property developed while he was employed by the University and Suppes would assign all rights to intellectual property to the University in return for employment by the University and the use of University resources and facilities.

53. On or about August 18, 1998, Sutterlin and the University entered into an employment agreement whereby Sutterlin agreed that the University would own all inventions and intellectual property developed while he was employed by the University and Sutterlin would assign all rights to intellectual property to the University in return for employment by the University and the use of University resources and facilities.

54. Valid consideration was given for these agreements including mutual obligations on the part of University and Suppes and Sutterlin, respectively.

55. The University has performed its obligations under the agreements.

56. Suppes and Sutterlin breached their employment agreements in failing to properly disclose intellectual property to the University, failing to acknowledge the University's ownership in such intellectual property, and in failing to execute proper assignment documents so that the University can appropriately protect its interests in said intellectual property.

57. The breach of the employment agreements by Suppes and Sutterlin has resulted in damages to the University in the form of lost revenue and business relationships.

2438245\01

## COUNT IV
### (Tortious Interference with Business Relationships)

58. Plaintiff incorporates by reference paragraphs 1 through 57 of the Complaint as though fully restated herein.

59. A direct business relationship existed between University and Missouri Soybean Merchandisers Council ("MSMC")and the Mid-America Research and Development Foundation ("MRDF") and an indirect business relationship existed between University and Senergy Chemical Corporation ("Senergy"). The relationship between the University with all three entities was jeopardized by the conduct of defendants.

60. Defendants were aware of the relationships between the University and these entities.

61. Defendants' conduct jeopardized the business relationships between the University and MSMC, MRDF and Senergy, by entering into licenses and contracts with no authority to do so, by engaging in unfair practices, by threatening to release confidential information to competitors, by using deception to obtain funds for projects and by refusing to cooperate in business dealings resulting in the loss of intellectual property rights.

62. Defendants did so intentionally and without justification or excuse.

63. The University was damaged through failed business dealings, injury to its business reputation, strained business relationships and lost business opportunities.

## COUNT V
### (Breach of Duty of Loyalty)

64. Plaintiff incorporates by reference paragraphs 1 through 63 of the Complaint as though fully restated herein.

65. Suppes and Sutterlin were employed by University, and as University employees have or had a duty of loyalty to the University.

66. While so employed, Suppes caused RA to enter into a licensing agreement with MRDF wherein RA claimed to be the sole owner of intellectual property that University owned.

67. While so employed, Suppes transferred all rights to Phase Change Material Technology to RA and transferred ownership of RA to Sutterlin. On information and belief, Sutterlin purported to transfer all of his rights in this and other University-owned inventions to RA, and, acting on behalf of RA, Sutterlin transferred some of those University-owned technologies to HT.

68. Suppes and Sutterlin thereby went beyond mere planning and preparation and acted in direct competition with the interests of the University, in breach of their duties of loyalty to the University.

69. As a direct result of such conduct, the University sustained damages, including, but not limited to, lost revenue, lost royalties, lost business reputation and lost business opportunities.

## COUNT VI
**(Equitable Action for Accounting)**

70. Plaintiff incorporates by reference paragraphs 1 through 69 of the Complaint as though fully restated herein.

71. Starting on August 1, 2001, Suppes was an employee of the University and had a relationship of trust and confidence with the University.

72. Starting on August 18, 1998, Sutterlin was an employee of the University and had a relationship of trust and confidence with the University.

73. As employees, Suppes and Sutterlin had a fiduciary, as well as a contractual, duty to disclose and assign all intellectual property to the University.

74. The University believes that Suppes and Sutterlin have wrongfully deprived it of intellectual property owned by the University by failing to disclose such intellectual property to the University. A complete list of such intellectual property cannot be obtained from any other source, as the U.S. Patent Office makes public only issued patents and some applications.

75. Despite repeated demands to Suppes, in the context of the grievance proceeding and elsewhere, he has refused to provide the University with a complete listing and accounting of the inventions and other intellectual property he has created, conceived or reduced to practice since August 1, 2001.

76. There is no legal remedy available to force defendants to disclose and account for all intellectual property generated since their respective dates of employment at the University and to account for all revenue and/or royalties and/or sales of all intellectual property since their respective dates of employment at the University.

77. There is an inherent need for discovery on the issue of what inventions, patent applications, contracts, licenses, sales and royalties were generated, created and received by defendants for intellectual property that was owned by the University.

## COUNT VII
### (Specific Performance)

78. Plaintiff incorporates by reference paragraphs 1 through 77 of the Complaint as though fully restated herein.

79. Suppes, Sutterlin and the University entered into employment contracts that went into effect on August 1, 2001 and August 18, 1998, respectively.

80. As part of these contracts, Suppes and Sutterlin agreed to abide by the Collected Rules of University in exchange for employment, salary and benefits and use of University resources and facilities.

2438245\01

81. As part of these contracts, the University owned all intellectual property created by Suppes and Sutterlin during their employment at the University, and Suppes and Sutterlin agreed to disclose all inventions and sign all documents requested by the University for it to protect its rights to the property.

82. Upon information and belief, Suppes and Sutterlin have breached their contractual obligations with the University by failing to account for all inventions created, contracts entered into and revenues generated from intellectual property developed during the course of their employment.

83. The University seeks specific performance of the contractual obligations of Suppes and Sutterlin.

84. Failure on the part of Suppes and Sutterlin to account for inventions, contracts and revenues unjustly injures University and the State of Missouri.

WHEREFORE, the University prays that this Court enter preliminary and permanent injunctive and declaratory relief as follows:

A. Ordering defendants to fully and completely account for all inventions created, conceived or reduced to practice by Suppes and/or Sutterlin since August 1, 2001 and August 18, 1998 respectively;

B. Evaluating all of said inventions and determining the dates of conception and reduction to practice, and declare that all such intellectual property is owned by and the property of the University;

C. Declaring that the language in Suppes' and Sutterlin's employment agreements created an automatic assignment of all intellectual property created by defendants to the University;

2438245\01

D. Ordering defendants to account for all revenues or other benefits received by any and all defendants from licenses and/or sales of University intellectual property;

E. Ordering defendants to account for all contracts, licenses, agreements, non-disclosures and/or other arrangements entered into between defendants and third parties with respect to the University's intellectual property;

F. Ordering defendants to sign any and all documents necessary or advisable to assign rights to or confirm ownership of all inventions to the University and to enable the University to protect its rights to and interest in such inventions, including responding to office actions with respect to pending patent applications;

G. Enjoining defendants from purporting to license, assign or otherwise transfer any inventions or other intellectual property that rightfully belongs to the University;

H. Granting specific performance on all valid contractual employment obligations; and

I. Awarding to plaintiff damages, attorneys fees and costs, and any other relief that this Court deems fair and just based on the record.

SHUGHART THOMSON & KILROY, P.C.,

/s/ Russell S. Jones, Jr.
RUSSELL S. JONES, JR.        MO #30814
RICHARD STITT                KS #14268
JOSHUA M. McCAIG             MO #56059
Twelve Wyandotte Plaza; 120 W. 12th Street
Kansas City, MO 64105
Phone: (816) 421-3355; Fax: (816) 374-0509
rjones@stklaw.com
rstitt@stklaw.com
jmccaig@stklaw.com
**ATTORNEYS FOR PLAINTIFF**